**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

ASYLON, INC.,

                Plaintiff,

vs.

                **JURY TRIAL DEMANDED**

HEXTRONICS, LLC,

                Defendant.

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Asylon, Inc., by and through its undersigned counsel, files this Complaint against Defendant Hextronics, LLC, for patent infringement and alleges as follows:

## THE PARTIES

1.      Asylon, Inc. ("Plaintiff" or "Asylon") is a corporate entity that conducts business under the trade name, Asylon Robotics. Asylon is a corporation established and existing under the laws of the State of Delaware, with its principal place of business at 52 Buttonwood Street, Norristown, Pennsylvania, 19401, United States.

2.      On information and belief, Defendant Hextronics, LLC ("Defendant" or "Hextronics") is a limited liability company established and existing under the laws of the State of Florida, with its principal place of business at 12194 128th Street, Miami, Florida, 33186, United States.

## JURISDICTION AND VENUE

3.      This is an action for patent infringement under the United States Patent Laws, 35 U.S.C. § 1 *et seq.*, specifically including 35 U.S.C. § 271.

4.      This Court has subject matter jurisdiction in this matter pursuant to 28 U.S.C. § 1331 and § 1338(a) and 35 U.S.C. § 281 because this action arises under the patent laws of the United States.

5.      This Court has personal jurisdiction over Hextronics because Hextronics has its regular and established principal place of business in, and has committed acts of infringement in, this judicial district.

6.      Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391(b), (c) and 28 U.S.C. § 1400(b).

## FACTS AND PATENTS IN SUIT

7.      This action for patent infringement arises out of Defendant's infringement of Plaintiff's U.S. Patent No. 12,030,403 (Ex. A), and U.S. Patent No. 11,318,859 (Ex. B) (collectively, the "Asserted Patents"). Plaintiff brings this action to compel Defendant to compensate Plaintiff for its infringement of the Asserted Patents and to cease its ongoing and continuous infringement of the Asserted Patents.

8.      On July 9, 2024, the U.S. Patent and Trademark Office duly and legally issued U.S. Patent No. 12,030,403 (the "'403 Patent") entitled "Methods for Reconfigurable Power Exchange for Multiple UAV Types" to Asylon. It names Damon C. Henry, Adam I. Mohamed, Brent McLaughlin, and David Dones as inventors.

9.      As of the filing of this action, Asylon is the owner of all right, title, and interest in the '403 Patent by virtue of a written assignment from the inventors listed above, recorded with the USPTO Assignment Recordation Branch on April 4, 2022, sufficient to confer standing (Ex. E). The '403 Patent lists Asylon as assignee.

10.     The '403 Patent is generally directed towards a method for swapping a power supply in an unmanned aerial vehicle ("UAV") through utilization of a reconfigurable power

station ("RPS"). The RPS autonomously exchanges modular "swap cartridges" to extend the flight range and mission capability of the UAV. The RPS includes a dynamic terminal landing system with markers that generate scalable composite images to guide autonomous landing of the UAV onto the RPS, a swapping mechanism positioned on a vertical elevator system that first removes the depleted cartridge from the UAV and subsequently obtains a second swap cartridge from the receiving bays within the RPS, and then transfers that second swap cartridge into the housing of the UAV. Afterwards, the RPS transmits a clearance signal for takeoff to the UAV once a pre-flight check of the UAV is complete.

11.     On May 3, 2022, the U.S. Patent and Trademark Office duly and legally issued U.S. Patent No. No.11,318,859 (the "'859 Patent") entitled "Methods for Reconfigurable Power Exchange for Multiple UAV Types" to Asylon. It names Damon C. Henry, Adam I. Mohamed, Brent McLaughlin, and David Dones as inventors.

12.     As of the filing of this action, Asylon is the owner of all right, title, and interest in the '859 Patent by virtue of a written assignment from the inventors listed above, recorded with the USPTO Assignment Recordation Branch on April 2, 2018, sufficient to confer standing (Ex. F). The '859 Patent lists Asylon as assignee.

13.     The '859 Patent also discloses a method of swapping out and replacing a power supply cartridge in a UAV through utilizing an RPS system. The RPS is comprised of a dynamic terminal landing system with visible or non-visible markers that transmit signals to a UAV when it is in proximity to the landing zone located on the RPS. After the UAV has landed, the RPS determines the orientation of the UAV relative to the landing zone. The RPS then removes the first swap cartridge on the UAV utilizing a swapping adaptor located on a vertical elevator system from within the RPS. The RPS obtains a second swap cartridge from the receiving bays within the RPS,

which are in fixed positions and aligned symmetrically relative to one another. The RPS installs the second swap cartridge into the housing on the UAV and then transmits a clearance signal for takeoff to the UAV once a pre-flight check on the UAV is complete.

14.     In accordance with 35 U.S.C. § 282, the '403 patent and '859 Patent are each presumed valid.

15.     On January 23, 2024, Asylon sent a detailed notice letter to Hextronics' leadership identifying Asylon's patent portfolio and enclosing a copy of the '859 Patent.[1] The letter explained that Hextronics' "Universal CS" product and related technologies appeared to be covered by the claims of the Asserted Patents (Ex. G).

16.     On January 31, 2024, Hextronics promptly acknowledged that it had received the notice letter and attachments and requested a claim chart "outlining which claims" Asylon believed Hextronics was incorporating (Ex. H).

17.     At the time of the initial notice, the letter specifically identified and attached the '859 Patent and referenced Asylon's published applications. Upon information and belief, Hextronics was on notice of Asylon's patented and published claims and of potential enhanced damages for willful infringement at least as early as the date the notice letter was first sent on January 23, 2024, and at least as late as when Hextronics confirmed receipt of the notice letter in its responsive letter to Asylon, on January 31, 2024.

18.     Following a period of time, on August 18, 2025, Asylon sent another notice letter to Hextronics expressly directing Hextronics' attention to the two Asserted Patents, the '859 Patent (claims 1 and 11) and the '403 patent (claims 1 and 11), and enclosed both patents in the letter as

---

[1] On January 24, 2024, Asylon transmitted the same notice letter by email to Hextronics' executives (Ex. I).

well for Hextronics' reference. Asylon invited Hextronics to discuss the identified claims in detail, also transmitting the August 18, 2025 letter by email to Hextronics on the same day (Ex. J).

19.     On September 25, 2025, Hextronics acknowledged receipt of the notice letter and sent a written response contending non-infringement based on its asserted operational differences, such as use of a "moving landing pad in which the aircraft lands within and then brought into the station." (Ex. K).

20.     On October 9, 2025, the parties met for a claims-focused meeting where Asylon leadership presented and walked through its claim interpretations and positions of infringement with Hextronics, highlighting the similarities between Asylon's patented technology and the Hextronics device. Asylon outlined these theories of infringement in presentation slides, attached hereto as Exhibit C.

21.     Following this meeting and Asylon's presentation, on October 27, 2025, Asylon followed up in good faith with Hextronics' CEO, Curt Larry, "to see if [Hextronics] wanted to move forward and discuss terms for a potential licensing deal." (Ex. L). Asylon has followed up with Hextronics regarding this proposition by email on multiple occasions following the meeting (including on November 21, 2025, December 5, 2025, and January 12, 2026), but there have been no further communications received from Hextronics related to this matter (Ex. M).

## COUNT I
## DIRECT INFRINGEMENT OF U.S. PATENT NO. 11,318,859 – 35 U.S.C. § 271(a)

22.     Plaintiff incorporates by reference the allegations in Paragraphs 1-21 as if fully set forth herein.

23.     Hextronics has directly infringed, and continues to directly infringe, literally or under the doctrine of equivalents, the claims of the '859 Patent by making, using, offering to sell, and/or selling in the U.S. its Hextronics Universal CS product, or "drone-in-a-box" system ("CS

Product" or "Accused Product"), which is covered by the claims, including at least claims 1 and 11, of the '859 Patent.

24.     Hextronics has been on notice of the '859 Patent and of Hextronics' infringement of that patent since at least as early as January 23, 2024, when Asylon sent its initial notice letter to Hextronics.

25.     Since that time, Asylon has sent Hextronics multiple additional notifications of the '859 Patent that clearly cite where Hextronics is infringing the patent's claims, starting with an August 18, 2025 notice letter identifying the alleged infringement of claims 1 and 11 of the '859 Patent, and including the '859 Patent for reference.

26.     On October 9, 2025, Asylon leadership presented and walked through its claim interpretations and positions of infringement for the '859 Patent with Hextronics (Ex. C).

27.     The claim charts below in Paragraph 29 are the same charts presented to Hextronics on October 9, 2025, and show how at least independent claims 1 and 11 of the '859 Patent read on Hextronics' "Universal CS" product, based on information currently available to Asylon and its attorneys. These claim charts are not meant to limit the scope of Asylon's infringement claim in any way and are intended to be without prejudice to Asylon's ability to assert different or additional claims of the '859 Patent against Hextronics and/or to apply such claims to the accused service or product different in view of additional information that Asylon and its attorneys may acquire during the course of this litigation.

28.     Claim 1 of the '859 Patent recites as follows: "A method of swapping a power supply in an unmanned aerial vehicle (UAV), comprising:

a.   transmitting one or more signals to a UAV via one or more markers or emitters
when the UAV is in proximity to a landing zone located on a reconfigurable
power station (RPS);

b.   determining an orientation of the UAV relative to the landing zone after the
UAV has landed;

c.   removing a first swap cartridge from the UAV via a swapping adaptor which is
positionable upon a vertical elevator system from within the RPS and lowering
the first swap cartridge into the RPS;

d.   obtaining a second swap cartridge via the swapping adaptor from one or more
receiving bays positioned within the RPS and lifting the second swap cartridge
separately from the one or more receiving bays within the RPS via the vertical
elevator system into alignment with a swap cartridge receptacle within a
housing on the UAV, wherein each of the one or more receiving bays are aligned
symmetrically relative to one another in a fixed position relative to the RPS;

e.   advancing the second swap cartridge along the swapping adaptor such that the
second swap cartridge is transferred into the housing on the UAV; and

f.   transmitting a clearance signal for take-off to the UAV via the RPS upon
completion of a preflight check of the UAV."

29.   Hextronics' "Universal CS" product (the "Accused Product") infringes each
element of Claim 1 of the '859 Patent:

| | |
|---|---|
| **1. A method of swapping a power supply in an unmanned aerial vehicle (UAV), comprising:** | |
| **transmitting one or more signals to a UAV via one or more markers or emitters when the UAV is in proximity to a landing zone located on a reconfigurable power station (RPS);** | The Hextronics Universal provides a landing zone via which a drone can precisely land. |
| **determining an orientation of the UAV relative to the landing zone after the UAV has landed;** | The Hextronics Universal performs post flight checks to ensure that the drone has arrived safely on the landing zone. |
| **removing a first swap cartridge from the UAV via a swapping adaptor which is positionable upon a vertical elevator system from within the RPS and lowering the first swap cartridge into the RPS;** | The Hextronics Universal comprises battery swapping mechanism with a vertical elevator system. |

NOT FOR COPYING OR DISTRIBUTION

| | |
|---|---|
| **obtaining a second swap cartridge via the swapping adaptor from one or more receiving bays positioned within the RPS and lifting the second swap cartridge separately from the one or more receiving bays within the RPS via the vertical elevator system into alignment with a swap cartridge receptacle within a housing on the UAV, wherein each of the one or more receiving bays are aligned symmetrically relative to one another in a fixed position relative to the RPS;** | The Hextronics Universal comprises up to four batteries that can be swapped via the elevator system. |
| **advancing the second swap cartridge along the swapping adaptor such that the second swap cartridge is transferred into the housing on the UAV; and** | The Hextronics Universal comprises up to four batteries that can be swapped with a battery swapping mechanism having a vertical elevator system. |



| transmitting a clearance signal for take-off to the UAV via the RPS upon completion of a preflight check of the UAV. | The Hextronics Universal runs a preflight check before UAV deployment, comprising checks to the cameras, the propellers, the UAV body, the battery, the landing pad, etc. |
|---|---|
|  |  |

(Ex. C).

30.    Upon information and belief, the Hextronics Accused Product transmits one or more signals to a UAV via one or more markers or emitters when the UAV is in proximity to a landing zone located on an RPS, satisfying the limitations of claim 1(a). Upon information and belief, the Hextronics device includes a landing zone that enables precise autonomous landing. Below is a screenshot image from a Hextronics video identifying the Hextronics landing zone.



(Screenshot from a video posted by Hextronics to YouTube at
https://www.youtube.com/@hextronics).

31.    Upon information and belief, the Hextronics Accused Product determines the orientation of the UAV relative to the landing zone after the UAV has landed through performing

9

post-flight checks to ensure that the UAV has arrived safely on the landing zone, meeting the UAV orientation determination limitation of claim 1(b).



(Screenshot from a video posted by Hextronics to YouTube, https://www.youtube.com/@hextronics).

32.     Upon information and belief, the Accused Product includes a battery-swapping mechanism with a vertical elevator system that removes a first swap cartridge from the UAV via the swapping adaptor that is positioned upon the vertical elevator system and then lowering the first swap cartridge into the battery charging slots within the Accused Product, satisfying the limitations of claim 1(c). The images below are screenshots from a Hextronics video depicting the loading and unloading of the battery cartridges. The first image below depicts the battery-swapping mechanism removing the first swap cartridge from the UAV. The second image below depicts the battery-swapping mechanism moving this first swap cartridge via a vertical elevator system into the power station.





(Annotated Screenshot from a video posted by Hextronics to YouTube,
https://www.youtube.com/watch?v=DYATi5UZlyA&t=109s).

33.     Upon information and belief, the Accused Product is comprised of up to four

batteries that can be swapped into the UAV via the swapping adaptor from one or more receiving

bays located within the battery charging station, and via the vertical elevator system, lifting the

11

second swap cartridge into alignment with the UAV's swap cartridge receptacle within the housing on the UAV, wherein each of the receiving bays are in fixed positions and aligned symmetrically relative to one another, satisfying the limitations of claim 1(d). Below is an image depicting the symmetrically aligned cartridges in the receiving bays within the RPS from the 2024 Hextronics Universal Quick Start Guide (Ex. D).



(Exhibit D at 13).

34.     Upon information and belief, the Accused Product advances the second swap cartridge into the housing on the UAV with a battery-swapping mechanism having a vertical elevator system, satisfying the limitations of 1(e). The vertical elevator system is seen in the still image below taken from a Hextronics 2024 Atlas and Universal CS Launch highlights video.



(Screenshot from a video posted by Hextronics to YouTube (at 1:23),
https://www.youtube.com/watch?v=8hha-c1NBfU).

35. Upon information and belief, the Accused Product also performs preflight checks before UAV deployment which includes, for example, checks to the cameras, propellers, UAV body, and the landing pad, and then transmits a clearance signal for take-off, satisfying the limitations of 1(f). Below are screenshots from a Hextronics video tutorial on how to run pre-flight checks on the Accused Product.



13



Verify propellers are proerly attached and show no signs of wear



Verify battery is properly locked in place without wear or bulging



Verify landing pad is clear of foreign debris



(Screenshot from a video posted by Hextronics to YouTube at
https://www.youtube.com/@hextronics).

36.     Claim 11 of the '859 Patent recites as follows: "A method of swapping a power

supply in an unmanned aerial vehicle (UAV), comprising:

      a.   receiving a UAV upon a landing zone located on a housing of a power

          station;

      b.   removing a first cartridge from the UAV via a swapping mechanism

          which is positionable upon a vertical elevator system within the power

          station and vertically moving the first cartridge into a first receiving bay

          within the power station RPS;

      c.    obtaining a second cartridge via the swapping mechanism from a

          second receiving bay positioned within the power station by lifting the

          second cartridge separately from a plurality of receiving bays within the

          power station via the vertical elevator system and into alignment with

          the UAV, wherein each of the receiving bays are aligned symmetrically

          relative to one another in a fixed position relative to the power station;

    d.   advancing the second cartridge via the vertical elevator system such that the second cartridge is transferred onto the housing on the UAV; and

    e.   clearing the UAV for take-off from the power station."

37.    Hextronics' Accused Product infringes each element of Claim 11 of the '859 Patent:

| **11. A method of swapping a power supply in an unmanned aerial vehicle (UAV), comprising:** | |
|---|---|
| **receiving a UAV upon a landing zone located on a housing of a power station;** | The Hextronics Universal provides a landing zone via which a drone can precisely land.<br> |
| **removing a first cartridge from the UAV via a swapping mechanism which is positionable upon a vertical elevator system within the power station and vertically moving the first cartridge into a first receiving bay within the power station RPS;** | The Hextronics Universal comprises battery swapping mechanism with a vertical elevator system.<br> |



| | |
|---|---|
| obtaining a second cartridge via the swapping mechanism from a second receiving bay positioned within the power station by lifting the second cartridge separately from a plurality of receiving bays within the power station via the vertical elevator system and into alignment with the UAV, wherein each of the receiving bays are aligned symmetrically relative to one another in a fixed position relative to the power station; | The Hextronics Universal comprises up to four batteries that can be swapped via the elevator system. |
| advancing the second cartridge via the vertical elevator system such that the second cartridge is transferred onto the housing on the UAV; and | The Hextronics Universal comprises up to four batteries that can be swapped with a battery swapping mechanism having a vertical elevator system. |
| clearing the UAV for take-off from the power station. | The Hextronics Universal runs a preflight check before UAV deployment, comprising checks to the cameras, the propellers, the UAV body, the battery, the landing pad, etc. |

(Ex. C).

38.      Upon information and belief, the Accused Product has a landing zone by which a UAV can precisely land, satisfying the limitations of claim 11(a).



(Screenshot from a video posted by Hextronics to YouTube,
https://www.youtube.com/@hextronics).

39.      Upon information and belief, the Accused Product includes a battery-swapping mechanism with a vertical elevator system that removes the first swap cartridge from the UAV via

17

a swapping mechanism that is positioned upon the vertical elevator within the power station and vertically moves this first cartridge into a first receiving bay within the power station RPS, satisfying the limitations of claim 11(b). The first image below depicts the battery-swapping mechanism removing the first swap cartridge from the UAV. The second image depicts the battery-swapping mechanism moving this first swap cartridge via a vertical elevator system into the receiving bay.





(Annotated screenshot from a video posted by Hextronics to YouTube,
https://www.youtube.com/watch?v=DYATi5UZlyA&t=109s).

40.     Upon information and belief, the Accused Product obtains a second cartridge via

the swapping mechanism from a second receiving bay positioned within the power station by

lifting the second cartridge separately from a plurality of receiving bays within the power station

into alignment with the UAV, wherein each of the receiving bays are aligned symmetrically relative

to one another in a fixed position relative to the power station. Upon information and belief, the

Accused Product is comprised of a plurality of batteries located within the power station that can

be swapped into the Accused Product via the swapping mechanism by lifting the second swap

cartridge into alignment with the UAV's swap cartridge receptacle via the products' vertical

elevator system, satisfying the limitations of claim 11(c). The first image below depicts the

symmetrically aligned batteries in the receiving bays within the RPS from the 2024 Hextronics

Universal Quick Start Guide, while the second image depicts the battery slot placement selection

panel for the Accused Product (Ex. D).



(Ex. D at 13).



(Ex. D at 13).

41.     Upon information and belief, the Accused Product advances the second cartridge into the housing of the UAV with a battery-swapping mechanism having a vertical elevator system, satisfying the limitations of claim 11(d). The image below shows the battery-swapping mechanism having a vertical elevator system.



(Screenshot from a video posted by Hextronics to YouTube (at 1:23),
https://www.youtube.com/watch?v=8hha-c1NBfU).

42.     Upon information and belief, the Accused Product also clears the device for takeoff from the power station by performing a preflight check, satisfying the limitations of claim 11(e). Below are screenshots from a Hextronics video tutorial on how to clear the UAV for takeoff from the power station by running pre-flight checks on the Accused Product.



Trigger the "Check Cameras" command



Trigger "Check HexCamera Images" to begin aircraft inspection



Verify propellers are proerly attached and show no signs of wear







(Screenshot from a video posted by Hextronics to YouTube,
https://www.youtube.com/@hextronics).

43.     Despite being put on notice of the '859 Patent and on notice of its infringement of

at least claims 1 and 11 since at least as early as January 23, 2024, and no later than January 31,

2024, Hextronics has not ceased making, using, offering to sell, and/or selling its Accused Product

despite multiple attempts by Asylon to come to an equitable and reasonable licensing agreement. Therefore, Hextronics' actions have been both deliberate and malicious.

44.     Hextronics' acts have been, and continue to be, without license or authorization from Asylon. Hextronics' use of a landing zone with markers/emitters, a vertical-elevator swapping adaptor, symmetrically aligned receiving bays, and preflight clearance signaling constitutes direct infringement under 35 U.S.C. § 271(a).

45.     As a result of Defendant's infringement, Plaintiff has suffered and continues to suffer damages in an amount to be proven at trial and is entitled to a preliminary and permanent injunction and all other relief as the Court deems necessary and equitable.

## COUNT II
## INDUCED INFRINGEMENT OF U.S. PATENT NO. 11,318,859 – 35 U.S.C. § 271(b)

46.     Asylon incorporates by reference the allegations in paragraphs 1-45 of this Complaint as if fully set forth herein.

47.     On information and belief, Hextronics knew of the '859 Patent and has been and is actively inducing others to infringe the claims of the '859 Patent both in the State of Florida and throughout the United States by making, offering to sell, selling, promoting, importing, licensing and otherwise distributing its Accused Product, intending third parties who acquire its Accused Product to use it, or at least knowing that third parties who acquire its Accused Product will use it.

48.     Because Hextronics' Accused Product practices at least claims 1 and 11 of the '859 Patent, as explained *supra*, those using the Accused Product are directly infringing the '859 Patent.

49.     Upon information and belief, Hextronics specifically intends that its customers perform the claimed steps of at least claims 1 and 11 of the '859 Patent, as evidenced by Hextronics' Quick Start Guides and user manuals that instruct users on how to position the UAV relative to landing guidance markers/emitters, execute an automated landing within the landing

zone, initiate a vertical-elevator battery swap using symmetrically aligned receiving bays, and conduct pre-flight checks culminating in a clearance signal to relaunch (Ex. D).

50.     Hextronics also deploys training videos, webinars, and online tutorials demonstrating the step-by-step workflows corresponding to the claimed methods and offers field-deployment assistance that configures systems and software to perform these workflows as instructed. (*See* Hextronics, YouTube**,** https://www.youtube.com/@hextronics.) These materials and services collectively encourage, instruct, and facilitate performance of the claimed methods of the '859 Patent by Hextronics' customers and users in the United States.

51.     On information and belief, Hextronics knew that using the Accused Product would be an act of direct infringement and thus knew that making, selling, promoting, importing, licensing and otherwise distributing its Accused Product would induce third parties to acquire and use the Accused Product, which would result in direct infringement of the claims of the '859 Patent. On information and belief, despite such knowledge, Hextronics has been and is actively inducing infringement of the claims of the '859 Patent by others.

52.     Despite being on notice of the '859 Patent, and despite the fact that the infringement of the claims of the '859 Patent was readily determinable by Hextronics when it was put on notice, Hextronics has not ceased making, offering to sell, selling, promoting, licensing, importing, and otherwise distributing its Accused Product. Therefore, Hextronics' actions have been both deliberate and malicious.

53.     On information and belief, Hextronics has continued and will continue to induce the infringement of the claims of the '859 Patent unless and until it is enjoined by this Court.

54.     As a result of Hextronics' inducement of infringement of the claims of the '859 Patent, Asylon has suffered damages, including without limitation lost profits and licensing royalties.

55.     By reason of said acts by Hextronics, Asylon has been and will continue to be seriously damaged and irreparably injured unless Hextronics is enjoined by this Court from the actions complained of herein, and thus, Asylon is without an adequate remedy at law. To the extent Hextronics' induced infringement is found to be willful, Asylon is entitled to enhanced damages under 35 U.S.C. § 284.

## COUNT III
## DIRECT INFRINGEMENT OF U.S. PATENT NO. 12,030,403 – 35 U.S.C. § 271(a)

56.     Asylon incorporates by reference the allegations in Paragraphs 1-55 as if fully set forth herein.

57.     Hextronics has directly infringed, and continues to directly infringe, literally or under the doctrine of equivalents, the claims of the '403 Patent by making, using, offering to sell, and/or selling in the U.S. the Accused Product which is covered by the claims, including at least claims 1 and 11, of the '403 Patent.

58.     On August 18, 2025, Asylon sent a notice letter both by mail and email to Hextronics informing it of its infringement of the '403 and '859 Patents. Asylon enclosed both patents in the notice correspondence. Hextronics acknowledged receipt by letter on September 25, 2025 contending noninfringement based on its asserted operational differences such as use of a "moving landing pad in which the aircraft lands within and then brought into the station." (Ex. K).

59.     On October 27, 2025, the parties met for a claims-focused meeting where Asylon leadership presented and walked through its claim interpretations and positions of infringement with Hextronics, highlighting the similarities between Asylon's patented technology and the

Hextronics device. Asylon outlined these theories of infringement in presentation slides, attached hereto as Exhibit C.

60.     The claim charts below in Paragraph 62 are the same charts presented by Asylon to Hextronics on October 9, 2025, and show how at least independent claims 1 and 11 of the '403 Patent read on Hextronics' "Universal CS" product, based on information currently available to Asylon and its attorneys. This claim charts are not meant to limit the scope of Asylon's infringement claim in any way and are intended to be without prejudice to Asylon's ability to assert different or additional claims of the '403 Patent against Hextronics and/or to apply such claims to the accused service or product different in view of additional information that Asylon and its attorneys may acquire during the course of this litigation.

61.     Claim 1 of the '403 Patent recites as follows: "A method of swapping a power supply in an unmanned aerial vehicle (UAV), comprising:

     a.   transmitting one or more signals to a UAV via one or more markers or emitters when the UAV is in proximity to a landing zone located on a reconfigurable power station (RPS);

     b.   receiving the UAV upon the landing zone;

     c.   removing a first swap cartridge from the UAV via a swapping adaptor which is positionable upon a vertical elevator system from within the RPS and lowering the first swap cartridge into the RPS;

     d.   obtaining a second swap cartridge via the swapping adaptor from one or more receiving bays positioned within the RPS and lifting the second swap cartridge separately from the one or more receiving bays within the RPS via the vertical elevator system into alignment with a swap

26

cartridge receptacle within a housing on the UAV, wherein each of the one or more receiving bays are aligned symmetrically relative to one another in a fixed position relative to the RPS;

e.  advancing the second swap cartridge along the swapping adaptor such that the second swap cartridge is transferred into the housing on the UAV; and

f.  transmitting a clearance signal for take-off to the UAV via the RPS upon completion of a preflight check of the UAV."

62.  Hextronics' Accused Product infringes each element of Claim 1 of the '403 Patent:

| 1. A method of swapping a power supply in an unmanned aerial vehicle (UAV), comprising: | | |
|---|---|---|
| transmitting one or more signals to a UAV via one or more markers or emitters when the UAV is in proximity to a landing zone located on a reconfigurable power station (RPS); | The Hextronics Universal provides a landing zone via which a drone can precisely land. |  |
| receiving the UAV upon the landing zone; | The Hextronics Universal provides a landing zone via which a drone can precisely land. |  |
| removing a first swap cartridge from the UAV via a swapping adaptor which is positionable upon a vertical elevator system from within the RPS and lowering the first swap cartridge into the RPS; | The Hextronics Universal comprises battery swapping mechanism with a vertical elevator system. |  |



| | |
|---|---|
| obtaining a second swap cartridge via the swapping adaptor from one or more receiving bays positioned within the RPS and lifting the second swap cartridge separately from the one or more receiving bays within the RPS via the vertical elevator system into alignment with a swap cartridge receptacle within a housing on the UAV, wherein each of the one or more receiving bays are aligned symmetrically relative to one another in a fixed position relative to the RPS; | The Hextronics Universal comprises up to four batteries that can be swapped via the elevator system. |
| advancing the second swap cartridge along the swapping adaptor such that the second swap cartridge is transferred into the housing on the UAV; and | The Hextronics Universal comprises up to four batteries that can be swapped with a battery swapping mechanism having a vertical elevator system. |
| transmitting a clearance signal for take-off to the UAV via the RPS upon completion of a preflight check of the UAV. | The Hextronics Universal runs a preflight check before UAV deployment, comprising checks to the cameras, the propellers, the UAV body, the battery, the landing pad, etc. |

(Ex. C).

63.     Upon information and belief, the Hextronics Accused Product transmits one or more signals to a UAV via one or more markers or emitters when the UAV is in proximity to a landing zone located on an RPS, satisfying the limitations of claim 1(a). The Hextronics device includes a landing zone that enables precise autonomous landing. Below is a screenshot from the Hextronics website illustrating the precision landing that is enabled using Hextronics' "autonomous landing algorithm."



**Precision Landing**

Eliminate pilot error using our proprietary autonomous landing algorithm.

(Screenshot from the Hextronics website, https://hex.us).

64.     Upon information and belief, the Accused Product receives the UAV upon the landing zone, satisfying the limitations of claim 1(b). Below is a screenshot from a Hextronics training video identifying the Hextronics landing zone.



**Monitor precision landing routine**

(Screenshot from a video posted by Hextronics to YouTube, https://www.youtube.com/@hextronics).

65.     Upon information and belief, the Accused Product removes a first swap cartridge from the UAV via a swapping adaptor which is positionable upon a vertical elevator system from

within the RPS and then lowers the first swap cartridge into the RPS, satisfying the limitations of

claim 1(c). The first image below depicts the battery-swapping mechanism removing the first swap

cartridge from the UAV. The second image below depicts the battery-swapping mechanism moving

this first swap cartridge via a vertical elevator system into the RPS within the power station.





(Annotated screenshot from a video posted by Hextronics to YouTube,
https://www.youtube.com/watch?v=DYATi5UZlyA&t=109s).

66.     Upon information and belief, the Accused Product obtains a second swap cartridge via the swapping adaptor from one or more receiving bays positioned within the RPS and then lifts the second swap cartridge separately from the one or more receiving bays within the RPS via the vertical elevator system into alignment with a swap cartridge receptacle within a housing on the UAV, wherein each of the one or more receiving bays are aligned symmetrically relative to one another in a fixed position relative to the RPS, satisfying the limitations of claim 1(d). Below is an image depicting the symmetrically aligned cartridges in the receiving bays within the RPS from the 2024 Hextronics Universal Quick Start Guide (Ex. D).



(Ex. D at 13).

67.     Upon information and belief, the Accused Product advances the second swap cartridge along the swapping adaptor such that the second swap cartridge is transferred into the housing on the UAV, satisfying the limitations of claim 1(e). The vertical elevator system is seen in the still image below taken from a Hextronics 2024 Atlas and Universal CS Launch highlight video. The second image below depicts the "Swap Battery" command that is run on the Accused Product wherein after the first swap cartridge is removed from the UAV and stored in the RPS, the second battery swap cartridge is transferred into the housing of the UAV.

31



(Screenshot from a video posted by Hextronics to YouTube (at 1:23),
https://www.youtube.com/watch?v=8hha-c1NBfU).



(Ex. D at 13).

68.     Upon information and belief, the Accused Product transmits a clearance signal for

take-off to the UAV via the RPS upon completion of a preflight check of the UAV, satisfying the

limitations of claim 1(f). The Accused Product performs preflight checks before UAV deployment,

including checks to the cameras, propellers, UAV body, and the landing pad, and then transmits a clearance signal for take-off. Below are image screenshots from a Hextronics video tutorial on how to run pre-flight checks on the Accused Product.













(Screenshot from a video posted by Hextronics to YouTube,
https://www.youtube.com/@hextronics).

69.     Claim 11 of the '403 Patent recites as follows: "A method of swapping a power supply in an unmanned aerial vehicle (UAV), comprising:

    a.  receiving a UAV upon a landing zone located on a housing of a power station;

    b.  removing a first cartridge from the UAV via a swapping mechanism which is positionable upon a vertical elevator system within the power station and vertically moving the first cartridge into a first receiving bay within the power station;

    c.  obtaining a second cartridge via the swapping mechanism from a second receiving bay positioned within the power station by lifting the second cartridge separately from a plurality of receiving bays within the power station via the vertical elevator system and into alignment with the UAV, wherein each of the receiving bays are aligned symmetrically relative to one another in a fixed position relative to the power station;

    d.  advancing the second cartridge via the vertical elevator system such that the second cartridge is transferred onto the housing on the UAV."

70.     Hextronics' Accused Product infringes each element of Claim 11 of the '403 Patent:

| 11. A method of swapping a power supply in an unmanned aerial vehicle (UAV), comprising: | |
|---|---|
| receiving a UAV upon a landing zone located on a housing of a power station; | The Hextronics Universal provides a landing zone via which a drone can precisely land.<br> |
| removing a first cartridge from the UAV via a swapping mechanism which is positionable upon a vertical elevator system within the power station and vertically moving the first cartridge into a first receiving bay within the power station; | The Hextronics Universal comprises battery swapping mechanism with a vertical elevator system.<br> |

| obtaining a second cartridge via the swapping mechanism from a second receiving bay positioned within the power station by lifting the second cartridge separately from a plurality of receiving bays within the power station via the vertical elevator system and into alignment with the UAV, wherein each of the receiving bays are aligned symmetrically relative to one another in a fixed position relative to the power station; | The Hextronics Universal comprises up to four batteries that can be swapped via the elevator system.<br> |
|---|---|
| advancing the second cartridge via the vertical elevator system such that the second cartridge is transferred onto the housing on the UAV. | The Hextronics Universal comprises up to four batteries that can be swapped with a battery swapping mechanism having a vertical elevator system.<br> |

(Ex. C).

71.     Upon information and belief, the Accused Product receives a UAV upon a landing zone located on a housing of a power station, satisfying the limitations of claim 11(a).



(Screenshot from a video posted by Hextronics to YouTube,
https://www.youtube.com/@hextronics).

72.     Upon information and belief, the Accused Product removes a first cartridge from the UAV via a swapping mechanism which is positionable upon a vertical elevator system within the power station and vertically moves the first cartridge into a first receiving bay within the power station, satisfying the limitations of claim 11(b). The first image below depicts the battery-swapping mechanism removing the first swap cartridge from the UAV. The second image depicts the battery-swapping mechanism moving this first swap cartridge via a vertical elevator system into a receiving bay within the power station.





(Annotated screenshot from a video posted by Hextronics to YouTube,
https://www.youtube.com/watch?v=DYATi5UZlyA&t=109s).

73.     Upon information and belief, the Accused Product obtains a second cartridge via

the swapping mechanism from a second receiving bay positioned within the power station by

lifting the second cartridge separately from a plurality of receiving bays within the power station

via the vertical elevator system and into alignment with the UAV, wherein each of the receiving

38

bays are aligned symmetrically relative to one another in a fixed position relative to the power station. The Accused Product is comprised of a plurality of batteries located within the power station that can be swapped into the Accused Product via the swapping mechanism by lifting the second swap cartridge into alignment with the UAV's swap cartridge receptacle via the products' vertical elevator system, satisfying the limitations of claim 11(c). Below is an image depicting the symmetrically aligned cartridges in the receiving bays within the RPS from the 2024 Hextronics Universal Quick Start Guide (Ex. D).



(Ex. D at 13).

74.     Upon information and belief, the Accused Product advances the second cartridge via the vertical elevator system such that the second cartridge is transferred onto the housing on the UAV, satisfying the limitations of claim 11(d). The vertical elevator system is seen in the still image below taken from a Hextronics 2024 Atlas and Universal CS Launch highlight video.



(Screenshot from a video posted by Hextronics to YouTube (at 1:23),
https://www.youtube.com/watch?v=8hha-c1NBfU).

75.     Despite being on notice of the '403 Patent and on notice of its infringement of at least claims 1 and 11 since at least August 18, 2025, Hextronics has not ceased making, using, offering to sell, and/or selling its Accused Product despite multiple attempts by Asylon to come to an equitable and reasonable licensing agreement. Therefore, Hextronics' actions have been both deliberate and malicious.

76.     Hextronics' acts have been, and continue to be, without license or authorization from Asylon. Hextronics' use of a landing zone with markers/emitters, a vertical-elevator swapping adaptor, symmetrically aligned receiving bays, and preflight clearance signaling constitutes direct infringement under 35 U.S.C. § 271(a).

77.     As a result of Defendant's infringement, Plaintiff has suffered and continues to suffer damages in an amount to be proven at trial and is entitled to a preliminary and permanent injunction and all other relief as the Court deems necessary and equitable.

## COUNT IV
## INDUCED INFRINGEMENT OF U.S. PATENT NO. 12,030,403 – 35 U.S.C. § 271(b)

78.     Asylon incorporates by reference the allegations in paragraphs 1-77 of this Complaint as if fully set forth herein.

79.     On information and belief, Hextronics knew of the '403 Patent and has been and is actively inducing others to infringe the claims of the '403 Patent both in the State of Florida and throughout the United States by making, offering to sell, selling, promoting, importing, licensing and otherwise distributing its Accused Product, intending third parties who acquire its Accused Product to use it, or at least knowing that third parties who acquire its Accused Product will use it.

80.     Because Hextronics' Accused Product practices at least claims 1 and 11 of the '403 Patent, as explained *supra*, those using the Accused Product are directly infringing the '403 Patent.

81.     Hextronics specifically intends that its customers perform the claimed steps of at least claims 1 and 11 of the '403 Patent, as evidenced by Hextronics' Quick Start Guides and user manuals that instruct users to navigate using landing guidance markers/emitters to identify a landing zone, execute an automated landing in that zone, actuate a vertical-elevator battery swap using symmetrically aligned receiving bays, and complete pre-flight checks culminating in a clearance signal to relaunch. Hextronics also deploys various training videos, webinars, and online tutorials demonstrating step-by-step workflows corresponding to the claimed methods and provide field-deployment assistance that configures systems and software to perform these workflows as instructed (Ex. D; *See also* Hextronics, YouTube**,** https://www.youtube.com/@hextronics). These materials and services collectively encourage, instruct, and facilitate performance of the claimed methods of the '403 Patent by Hextronics' customers and users in the United States.

82.     On information and belief, Hextronics knew that using the Accused Product would be an act of direct infringement and thus knew that making, selling, promoting, importing,

licensing and otherwise distributing its Accused Product would induce third parties to acquire and use the Accused Product, which would result in direct infringement of the claims of the '403 Patent. On information and belief, despite such knowledge, Hextronics has been and is actively inducing infringement of the claims of the '403 Patent by others.

83.     Despite being on notice of the '403 Patent, and despite the fact that the infringement of the claims of the '403 Patent was readily determinable by Hextronics when it was put on notice, Hextronics has not ceased making, offering to sell, selling, promoting, licensing, importing, and otherwise distributing its Accused Product. Therefore, Hextronics' actions have been both deliberate and malicious.

84.     On information and belief, Hextronics has continued and will continue to induce the infringement of the claims of the '403 Patent unless and until it is enjoined by this Court.

85.     As a result of Hextronics' inducement of infringement of the claims of the '403 Patent, Asylon has suffered damages, including without limitation lost profits and licensing royalties.

86.     By reason of said acts by Hextronics, Asylon has been and will continue to be seriously damaged and irreparably injured unless Hextronics is enjoined by this Court from the actions complained of herein, and thus, Asylon is without an adequate remedy at law. To the extent Hextronics' induced infringement is found to be willful, Asylon is entitled to enhanced damages under 35 U.S.C. § 284.

## **JURY DEMAND**

Pursuant to Rule 38, of the Federal Rules of Civil Procedure, Asylon demands a trial by jury on all issues triable as such.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the following relief:

A.     A judgment be entered that Defendant infringes or has infringed one or more claims of the Asserted Patents;

B.     A judgment be entered that Defendant has induced others to infringe one or more claims of the Asserted Patents;

C.     That, in accordance with 35 U.S.C. § 283, Defendant and all affiliates, employees, agents, officers, directors, attorneys, successors, and assigns and all those acting on behalf or in active concert or participation with any of them, including partners, distributors, resellers and customers, be preliminarily and permanently enjoined from (1) infringing on the Asserted Patents; (2) making, using, selling, offering for sale and/or importing any products and/services that infringe the Asserted Patents; and (3) inducing others to infringe the Asserted Patents;

D.     An award of damages, together with prejudgment and post-judgment interest sufficient to compensate for Defendant's infringement under 35 U.S.C. § 284;

E.     A judgment holding Defendant's infringement of the Asserted Patents to be willful, and a trebling of damages pursuant to 35 U.S.C. § 284;

F.     If this case is determined to be exceptional under 35 U.S.C. § 285, that Plaintiff be awarded its reasonable attorneys' fees;

G.     An award of an ongoing reasonable royalty for any post-verdict and post-judgment infringement of the Asserted Patents;

H.     An award for costs and expenses in this action; and

I.     Such other and further relief the Court may deem just and proper.


Dated: February 25, 2026            THOMPSON HINE LLP

                                        */s/ John C. Allerding*

John C. Allerding
Florida Bar No. 1052628
**THOMPSON HINE LLP**
3560 Lenox Road NE, Suite 1600
Atlanta, Georgia 30326
Telephone:  404-541-2900
Facsimile:  404-541-2905
*John.Allerding@ThompsonHine.com*

*Attorney for Plaintiff*
*Asylon, Inc.*